UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT CHATTANOOGA

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | No. 1:21-cr-00151-CLC-CHS |
| v. ) | |
| ) | |
| JAMES WILLARD THURMAN ) | |

## REPORT AND RECOMMENDATION

### I. Introduction

This matter is before the Court upon Defendant James Willard Thurman's Motion to Suppress [Doc. 32] which the District Court referred to this Court for a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B)-(C). On the evening of November 10, 2020, a sheriff's deputy arrived at Defendant's property in response to a report of a gunshot at the property. Defendant admitted to the deputy that he attached a shotgun shell to a flare gun and fired one shot. The deputy located and confiscated the flare gun and some unused shotgun shells. The deputy then read Defendant his *Miranda* rights. Defendant seeks to suppress the statements he made during the encounter prior to being Mirandized, as well as the physical evidence found. For the reasons stated herein, it is **RECOMMENDED** that the motion to suppress be **DENIED**.

### II. Facts

The Court conducted an evidentiary hearing on the motion to suppress on October 19, 2022. Former McMinn County Sheriff's Deputy Derrick Saxe was the only witness who testified at the hearing. Based upon the evidence presented at the hearing, the Court makes the following findings of fact:

- At the time of the incident, Deputy Saxe was wearing a body camera. Based on his demeanor and the consistency between his testimony and the video evidence, the Court finds Deputy Saxe to be a credible witness.

- Deputy Saxe received a notification that there had been a gunshot at Defendant's property. Deputy Saxe was less than a mile away from Defendant's property at the time of the notification. It was nighttime and dark out.

- Deputy Saxe was familiar with Defendant and had been to his property previously. Deputy Saxe believed Defendant was a convicted felon. Deputy Saxe also knew that Defendant routinely hosted certain guests at his property and that one of those regular guests was a convicted felon.

- Deputy Saxe immediately drove to Defendant's property. Fewer than 5 minutes elapsed between receipt of the notification and Deputy Saxe's arrival at Defendant's property. The gate to Defendant's driveway was open. Deputy Saxe drove the length of the driveway and parked near its terminus.

- Deputy Saxe exited his vehicle and began walking toward Defendant's living area.

- Defendant's living area consisted of two distinct components. First, a small shelter in the form of a utility shed located on the side of the property opposite the driveway. Second, an outdoor "living area"—located between the utility shed and the end of the driveway—consisting of a fire ring, various outdoor cooking tools, a sleeping mat, and other miscellaneous living items.

- Defendant was located by a campfire in the outdoor living area when Deputy Saxe arrived. As Deputy Saxe approached, he asked Defendant, "How's it going James? You doing alright?" Defendant responded, "I'm good. You?" Deputy Saxe replied, "I'm good. Where's your company at?"

- The distance from Deputy Saxe's vehicle to the outdoor living area was roughly 17 yards. This initial exchange between Deputy Saxe and Defendant occurred during the time it took Deputy Saxe to close his vehicle door walk about halfway to Defendant's living area.

- After discussing Defendant's lack of company and the reasons therefor, Deputy Saxe said, "Come here for just a minute. You got anything in your pockets?" Defendant replied, "Nah."

- Deputy Saxe then stated, "We just literally got a call from you shooting a gun. You got a gun out here?" Defendant answered, "I shot one time [unintelligible] back here." Deputy Saxe asked, "What for?" Defendant replied, "Just to see if it'd work—flare gun." Deputy Saxe responded, "Okay. Where's it at?" Defendant replied, "Right here."

- Deputy Saxe then collected the flare gun. He also confirmed Defendant was a convicted felon. Deputy Saxe told Defendant that he was not under arrest; however, he placed handcuffs on Defendant for safety while he finished securing the area.

- Deputy Saxe answered questions from Defendant and made sure Defendant understood what was happening. Among other things, Deputy Saxe and Defendant discussed the flare gun and the fact that Defendant had placed a shotgun shell in the flare gun. Deputy Saxe again confirmed that Defendant was a convicted felon. Deputy Saxe then secured several unused shotgun shells from a box on the ground in the outdoor living area and confirmed that they were the only shotgun shells possessed by Defendant.

- Deputy Saxe then read Defendant his *Miranda* rights.

### III. Discussion

Defendant claims that Deputy Saxe's actions constitute an unconstitutional warrantless search of the curtilage to his home. He also claims that Deputy Saxe's questions to Defendant—before he read Defendant his *Miranda* rights—render Defendant's answers inadmissible at trial.

#### A. Warrantless Search

Defendant claims that: (1) Defendant's entire property is curtilage; or (2) in the alternative, Defendant's outdoor living area is curtilage. Defendant maintains that, if Deputy Saxe executed a warrantless search of Defendant's curtilage, such a search could be in violation of Defendant's constitutional rights.[1]

The Fourth Amendment provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated[.]" U.S. Const. amend. IV. "A warrantless search or seizure is 'per se unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions.'" *United States v. Roark*, 36 F.3d 14, 17 (6th Cir. 1994) (quoting *Katz v. United States*, 389 U.S. 347, 357 (1967)); *see United States v. Sweeney*, 891 F.3d 232, 235 (6th Cir. 2018) (citing *California v. Carney*, 471 U.S. 386, 390) (1985)).

---

[1] As analyzed below, there are exceptions to the warrant requirement that could still render the search constitutionally sound.

According to the Supreme Court, "the area immediately surrounding and associated with the home—what our cases call the curtilage—[is] part of the home itself for Fourth Amendment purposes." *Fla. v. Jardines*, 569 U.S. 1, 4 (2013) (quoting *Oliver v. United States*, 466 U.S. 170, 180 (1984) (internal quotes removed)). Four factors are considered useful in determining whether an area falls within the home's curtilage: (1) the area's proximity to the home; (2) whether the home and the area are within a shared enclosure; (3) the nature of activities in the area; and (4) efforts to conceal the area from observation by the public. *United States v. Dunn*, 480 U.S. 294, 301 (1987). But the central question is "whether the area in question is so intimately tied to the home itself that it should be placed under the home's 'umbrella' of Fourth Amendment protection." *Id.*

The Court concludes that Defendant's entire property is not curtilage. On the one hand, a fence encloses three sides of the property, with woods bordering the fourth, and Defendant has a no trespassing sign on the fence. However, much of the property is a fair distance from the utility shed "home" on the property; the activities engaged in on most of the property are not home-like uses; and much of the property is readily visible to the passing public. Most importantly though, most of the property, including the driveway, is not intimately tied to the "home" (the utility shed) in any meaningful way.

The issue of whether the outdoor living area can be considered "curtilage" is a closer call. However, assuming *arguendo* that Defendant's outdoor living area is curtilage (an assertion the Court does not accept), Defendant's constitutional rights still were not violated.

The Supreme Court has made clear that "a police officer not armed with a warrant may approach a home and knock." *Fla. v. Jardines*, 569 U.S. 1, 8 (2013). Here, Deputy Saxe drove through an open gate and down Defendant's driveway to do a general check in response to the report of a "shot fired" on the property. He exited his vehicle, started walking toward Defendant—

who was in the outdoor living area—and immediately greeted him with, "How's it going James? You doing alright?" This verbal greeting was the virtual equivalent of a knock on the door of a residence—and, it was certainly the most practical equivalent when there was no door, sill or, indeed, any structure upon which to knock. Defendant could have refused to talk with Deputy Saxe; however, he chose to do so. Thus, even if Deputy Saxe at some point crossed an imaginary threshold into Defendant's curtilage, the initial interaction between Deputy Saxe and Defendant was purely consensual. Subsequently, once Deputy Saxe inquired about any company on the property and learned that Defendant was alone that night, the legal nature of the encounter changed.

While the Fourth Amendment generally requires a warrant prior to a search, one exception to the warrant requirement is the investigatory stop. *See Terry v. Ohio*, 392 U.S. 1 (1968). A law enforcement officer conducts an investigatory stop, also called a "*Terry* stop," when he or she briefly detains a person without probable cause in order to investigate a possible crime. *See Terry*, 392 U.S. 1; *United States v. Lyon,* 687 F.3d 754,763-64 (6th Cir. 2012); *United States v. Bailey*, 302 F.3d 652 (6th Cir. 2002). In order to conduct an investigatory stop within constitutional boundaries, an officer must have a reasonable suspicion based on specific and articulable facts that the individual he seeks to detain is involved in criminal activity. *Terry*, 392 U.S. 1; *United States v. Arvizu*, 534 U.S. 266, 750 (2002); *Lyons*, 687 F.3d at 764. Reasonable suspicion is a "less demanding standard than probable cause." *Alabama v. White*, 496 U.S. 325, 330 (1990). "Reasonable suspicion must be considered 'under the totality of the circumstances, considering all of the information available to law enforcement officials at the time.'" *Lyons*, 687 F.3d at 763 (quoting *Humphrey v. Mabry*, 482 F.3d 840, 846 (6th Cir. 2007)). The government bears the

burden to prove by a preponderance of the evidence that police had reasonable suspicion to make an investigative stop. *United States v. Torres-Ramos*, 536 F.3d 542, 552 (6th Cir. 2008).

Here, Deputy Saxe had been dispatched to Defendant's property because of a report of a gun shot at that property. Upon arrival at the property, he learned that Defendant was alone on the property. And, based on previous interactions with Defendant, Deputy Saxe knew that Defendant was a convicted felon. These specific and articulable facts provided Deputy Saxe with a reasonable suspicion that Defendant was involved in criminal activity, *to wit*, being a felon in possession of a firearm and/or ammunition. Thus, Deputy Saxe was authorized to conduct a *Terry* stop, which he proceeded to do. He immediately asked Defendant if he had anything in his pockets, informed Defendant of the report of a gunshot, and inquired about a gun. He saw and secured the flare gun. And, when he learned that there were additional shotgun shells nearby, he secured those as well. Though Defendant does not specifically object to the reasonableness of the scope and duration of the *Terry* stop, the Court finds that the stop was reasonable in scope and duration under the circumstances.

Thus, Deputy Saxe did not engage in an unconstitutional warrantless search of Defendant and his property.

**B.      Statements Prior to *Miranda* Warning**

Defendant claims that, because he was detained by Deputy Saxe, he was entitled to receive *Miranda* rights before answering any questions. Thus, Defendant claims that the answers he gave to Deputy Saxe's questions—before the *Miranda* rights were administered—are inadmissible at trial.

Generally, law enforcement needs to give *Miranda* rights before asking a person questions when "the person is taken into 'custody' or his freedom has otherwise been significantly restrained."

*Oregon v. Elstad*, 470 U.S. 298, 309 (1985) (citing *Miranda v. Arizona*, 384 U.S. 436, 478 (1966)). However, "[t]he very nature of a *Terry* stop means that a detainee is not free to leave during the investigation, yet is not entitled to *Miranda* rights." *United States v. Thomas*, 381 F. App'x 495, 500 (6th Cir. 2010) (quoting *United States v. Swanson*, 341 F.3d 524, 528 (6th Cir. 2003)).

Deputy Saxe was conducting a valid *Terry* stop. Therefore, he did not need to give *Miranda* rights to Defendant prior to asking him questions within the scope of the stop. During the *Terry* stop, Deputy Saxe asked about the contents of Defendant's pockets; whether Defendant shot a gun; why Defendant shot a gun; the location of the gun; why Defendant had a shotgun shell on a flare gun; and whether Defendant possessed any more ammunition. Deputy Saxe also twice confirmed that Defendant was a convicted felon, and he responded to several questions from the Defendant to assure that Defendant understood the need for and purpose of the investigation. Deputy Saxe's questions were all directly related to his reasonable suspicion that Defendant was a felon in possession of a firearm and/or ammunition.

Therefore, Deputy Saxe was not required to read Defendant his *Miranda* rights prior to the time that he actually provided them. Consequently, Defendant's answers to Deputy Saxe's questions—prior to his *Miranda* rights being administered—are not inadmissible at trial on such grounds.

## IV. Conclusion

For the reasons stated herein, it is **RECOMMENDED**[2] that Defendant's Motion to Suppress [Doc. 32] be **DENIED**.

---

[2] Any objections to this Report and Recommendation must be served and filed within fourteen (14) days after service of a copy of this recommended disposition on the objecting party. Such objections must conform to the requirements of Rule 72(b) of the Federal Rules of Civil Procedure. Failure to file objections within the time specified constitutes a forfeiture of the right to appeal the District Court's order. *Thomas v. Arn*, 474 U.S. 140, 88 L.Ed.2d 435, 106 S. Ct. 466 (1985). The district court need not provide *de novo* review where objections to this report and recommendation are frivolous, conclusive or general. *Mira v. Marshall*, 806 F.2d 636 (6th Cir. 1986). Only specific objections are reserved for appellate review. *Smith v. Detroit Federation of Teachers*, 829 F.2d 1370 (6th Cir. 1987).

**ENTER.**

/s/ *Christopher H. Steger*
UNITED STATES MAGISTRATE JUDGE