UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT CHATTANOOGA

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) Case No: 1:21-cr-151 |
| v. | ) |
| | ) Judge Curtis L. Collier |
| JAMES WILLARD THURMAN | ) Magistrate Judge Christopher H. Steger |

## **M E M O R A N D U M**

On September 21, 2022, Defendant James Willard Thurman filed a motion to suppress the fruits of a warrantless search and oral statements he made to a law enforcement officer on November 10, 2020. (Doc. 32.) Defendant argues the warrantless search was unconstitutional because he had a reasonable expectation of privacy in the curtilage of his home. (Doc. 33 at 5.) He argues his oral statements were made in violation of his constitutional rights because he made them while he was seized, but he was not told his rights under *Miranda v. Arizona*, 384 U.S. 436 (1966). (*Id.* at 8.) The United States (the "Government") responded in opposition, arguing the open-fields doctrine applied to the warrantless search and Defendant had voluntarily made the statements in an objectively uncoercive encounter. (Doc. 37 at 3, 10.) Defendant replied that the area where the search occurred should be considered curtilage based on how Defendant used it. (Doc. 38 at 3.) Additionally, Defendant's confession was "extracted . . . using the intimidation of" the law enforcement officer's entry into Defendant's "private space." (*Id.* at 6.)

Magistrate Judge Christopher H. Steger held an evidentiary hearing on the motion on October 19, 2022, and issued a report and recommendation (the "R&R") pursuant to 28 U.S.C. § 636(b)(1)(B) on December 12, 2022, recommending the motion to suppress be denied. (Doc. 45.) Among other findings, the R&R concluded that Defendant's entire property was not

1

curtilage but noted that the "issue of whether the outdoor living area can be considered 'curtilage' is a closer call," although it did not determine whether it is curtilage. (*Id.* at 4.) Defendant objected to the R&R on December 22, 2022. (Doc. 46.) The Government responded to the objection on January 9, 2023, after the Court granted a four-day extension to respond. (Docs. 50, 51.)

The Court has reviewed the transcript of the hearing, the exhibits introduced at the hearing, and the briefs the parties filed before and after the R&R issued. The Court will **ACCEPT AND ADOPT** the R&R but **MODIFY** page four of the R&R: Defendant's outdoor living area, including the fire pit, is curtilage. Defendant's motion to suppress (Doc. 32) will be **DENIED**.

I.   **STANDARD OF REVIEW**

Pursuant to 28 U.S.C. § 636(b)(1)(C), this Court must "make a de novo determination of those portions of the [R&R] to which objection is made" and "may accept, reject, or modify, in whole or in part," the magistrate judge's findings or recommendations. The Court has "broad discretion" in conducting a *de novo* determination and is not required to rehear any contested testimony. *United States v. Raddatz*, 447 U.S. 667, 674, 681 (1980). "Congress intended to permit whatever reliance a district judge, in the exercise of sound judicial discretion, chose to place on the magistrate's proposed findings and recommendations." *Id.* at 676. The Magistrate Judge, as the factfinder, had the opportunity to observe and hear the witnesses and assess their demeanor, putting him in the best position to determine credibility. See *Moss v. Hofbauer*, 286 F.3d 851, 868 (6th Cir. 2002); *United States v. Hill*, 195 F.3d 258, 264–65 (6th Cir. 1999). The Magistrate Judge's assessment of witnesses' testimony is therefore entitled to deference. *United States v. Irorere*, 69 F. App'x 231, 236 (6th Cir. 2003).

## II. BACKGROUND

The R&R begins with a detailed summary of the procedural history and the testimony provided by the witnesses at the suppression hearing. (Doc. 45 § II.) Defendant does not object to this portion of the R&R, and the Court incorporates Section II of the R&R by reference. The following summary of the factual background is derived from the R&R and the evidence presented at the hearing.

Around 7:17 p.m. on November 10, 2020, Derrick Saxe, a K-9 handler patrolman with McMinn County's Sheriff's Department, went to Defendant's residence after one of Defendant's neighbors called in to report gunshots coming from Defendant's property. (Doc. 44 at 4, 7, 9; Gov. Ex. 1 at 19:17:32.) Saxe was concerned because he knew Defendant had had "unsavory people," including a convicted felon, come stay at his residence, which had led to domestic disturbances in the past. (Doc. 44 at 10.) Saxe also knew Defendant is a convicted felon. (*Id.* at 11.) Defendant's residence is 2603 Cardinal Street, Athens, Tennessee, which is "just outside" the city limits of Athens and is not in one of the more rural parts of McMinn County. (Doc. 44 at 12; Def. Ex. 9.) When Saxe arrived at Defendant's residence, he turned off the road and entered Defendant's driveway. (Doc. 43 at 35; Doc. 44 at 14, 22.) He did not see a "no trespassing" sign, and the gate to the driveway was open. (Doc. 43 at 7; Doc. 44 at 14.) Defendant's residence could only be accessed by his driveway because there was a fence separating his property from his neighbor's paved driveway. (Doc. 43 at 22.) In addition to the gate on the driveway, the property is enclosed on two sides by wire fencing and the rear of the property is obstructed by mature trees and vegetation. (*Id.* at 10–12.) The driveway was approximately twenty to twenty-five yards

3

long; Saxe did not have any obstructions preventing him from reaching the end of the driveway. (Doc. 44 at 14–15.)

When Saxe parked his patrol car, he encountered Defendant, who was sitting by "a campfire" that was "[j]ust offset to the left" of the driveway by "a little bit." (*Id.* at 16–17.) Defendant was sitting on a mattress without a shirt on (the temperature was around 70 degrees Fahrenheit). (*Id.* at 73.) This outdoor living area was where Defendant ordinarily camped, entertained his guests, and cooked. (*Id.* at 61, 82.) Defendant was living in a small utility shed nearby that was equipped with electricity for lighting. (*Id.* at 60, 65.) Defendant also had a power pole that provided electricity for pumping water. (*Id.* at 65.) In addition to the mattress, there were bicycles, trash, and other items placed around the outdoor living area. (*Id.* at 60–61.) Saxe walked approximately ten to fifteen yards from his parked car to talk to Defendant. (*Id.* at 23.) Defendant was seated and did not immediately get up, but he stood up when Saxe asked him to. (*Id.* at 24.)

Saxe said, "How's it going James, you doing alright?" and asked, "Where's your company at?" (Doc. 45 at 2.) Saxe told him to "come here for just a minute" and asked him if he had anything in his pockets. (*Id.*) Saxe stated that the police had received a call about Defendant shooting a gun, so he asked Defendant, "You got a gun out here?" (*Id.*) Defendant said he "shot one time . . . back here." (Gov. Ex. 1 at 19:16:10–19:16:12.) When he said that, he used his right hand to point at an area to his left. (*Id.*) He pointed again at a spot on the ground, then lit a cigarette. (*Id.* at 19:16:15–19:16:17.) Saxe asked, "Where's it at?" (Doc. 45 at 2.) Defendant showed him, after which Saxe bent down to pick up the flare gun. (Gov. Ex. 1 at 19:16:20–19:16:25.) Saxe asked Defendant, "Aren't you a convicted felon?" (*Id.* at 19:16:30–19:16:31.)

4

Defendant said he was, but said it was "just a flare gun." (*Id.* at 19:16:33.) Saxe detained Defendant, including handcuffing him with his hands behind his back, and told him to "drop his cigarette" and sit down. (*Id.* at 19:16:38–19:16:42.) Saxe handcuffed Defendant because Saxe was "the only one there" and he "didn't know if there was anyone else on the property." (Doc. 44 at 28.) During this approximately three-minute detention, Saxe recovered the remaining shells in the outdoor living area. (Doc. 45 at 3.) Defendant made statements, such as "I didn't think there was a problem with it." (Gov. Ex. 1 at 19:17:23.) Saxe subsequently read to Defendant his *Miranda* rights using a card he carries. (Doc. 44 at 29.)

## III. ANALYSIS

Defendant objects to the R&R on two grounds. First, he objects that the R&R "ignored the heightened protection provided by the curtilage and made no finding about whether Officer Saxe trespassed into the most private areas of the Defendant[']s home." (Doc. 46 at 1.) Second, he objects that the R&R's application of *Terry v. Ohio*, 391 U.S. 1 (1968), ignores where the seizure of Defendant occurred. (*Id.* at 10.) The Court will address each in turn.

### A. Suppression of the Flare Gun and Ammunition

Defendant first objects to the R&R's conclusion that Defendant's outdoor living area was not within the curtilage of the home. (Doc. 46 at 1.) He argues that the R&R erred by failing to apply the factors from *United States v. Dunn*, 480 U.S. 294, 301 (1987), to determine whether the area was so intimately tied to the home that it should be protected by the Fourth Amendment. (*Id.* at 2.) He "objects to the lower standard of reasonable suspicion to support the officer's trespass into the defendant's home." (*Id.* at 4.) Walking through each of the *Dunn* factors, he argues they "firmly establish" that the encounter between him and Saxe occurred in the curtilage. (*Id.* at 6.)

5

In particular, Defendant stresses that the outdoor living area was his primary living space where he cooked, relaxed, entertained, and slept. (*Id.* at 9.) He contends that the R&R's categorization of the encounter between Defendant and Saxe as a *Terry* stop would permit law enforcement officers to detain people in "the most intimate places of their homes," including in the bedroom, bathroom, and living room in the middle of the night. (*Id.*) Therefore, he argues, the R&R "erred in focusing on the actions of the officer and not whether the officer was *lawfully in a position* to make his observations"; because Saxe was not in a lawful position to observe the ammunition and flare gun, the remedy for such a constitutional violation is suppression. (*Id.* at 10.)

The Government responds that the R&R properly concluded that the entirety of Defendant's property was not curtilage. (Doc. 50 at 3.) The Government argues that Saxe "did no more" than what any member of the public could do: "drive through an open gate and down a short driveway." (*Id.* at 4.) The Government does not analyze the *Dunn* factors, instead urging the Court to decide whether the government's intrusion infringes upon the personal and societal values protected by the Fourth Amendment, as discussed by *Oliver v. United States*, 466 U.S. 170, 182–93 (1984). (*Id.* at 3–4.) It argues that Saxe's intrusion does not infringe upon the personal and societal values protected by the Fourth Amendment. (*Id.*)

The curtilage is protected by the Fourth Amendment "because people have both actual and reasonable expectations that many of the private expectations of home life often occur outside the house." *United States v. Jenkins*, 124 F.3d 768, 772 (6th Cir. 1997). The *Dunn* factors are: (1) the proximity of the area claimed to be curtilage to the home; (2) whether the area is included within an enclosure surrounding the home; (3) the nature of the uses to which the area is put; and

6

(4) the steps taken by the resident to protect the area from observation by people passing by. 480 U.S. at 301.

Here, the *Dunn* factors weigh in favor of finding Defendant's outdoor living area to be curtilage protected by the Fourth Amendment. First, the outdoor living area is in close proximity to the utility shed that was Defendant's home, as indicated by the diagram Saxe marked in the suppression hearing. (Gov. Ex. 2.) Indeed, in Saxe's body camera footage, the shed's interior lighting can be seen in the background while he is talking to Defendant. (Doc. 44 at 72; Gov. Ex. 1 at 19:16:00–19:16:16.) Second, the outdoor living area and the house lie within the same fenced-off area. According to satellite photos, they are surrounded on three sides by wire fencing and thick vegetation on the side of the property facing the road. (Def. Ex. 6, 7, 8.) This factor weighs in Defendant's favor. *Dunn*, 480 U.S. at 302. Third, Defendant used the outdoor living area for tasks that are normally "associated with the activities and privacies of domestic life." *Hardesty*, 461 F.3d at 653. There were cans, cooking supplies, and trash around the firepit, along with a mattress on the ground. (Doc. 44 at 73.) During his encounter with Saxe, Defendant was seen sitting on that mattress shirtless. (*Id.*) These are all activities that would typically be conducted in private in the home, especially sitting while shirtless. This factor, although not dispositive, heavily weighs in Defendant's favor. Fourth, Defendant took not many steps to protect his outdoor living area from observation by passing individuals. The gate to the driveway was open when Saxe arrived, allowing him to drive up, and the property was closely surrounded by other residences and other people's cars, as evidenced by the satellite photos. (Def. Ex. 1; Gov. Ex. 2.) In *Jenkins*, the defendants lived in a "remote and sparsely populated rural area where they would have had no particular reason to believe that they needed to construct a high

impenetrable fence around the backyard in order to ensure their privacy," so the court reasoned that their erection of a wire fence militated in their favor. 124 F.3d at 770, 773. Defendant did have a wire fence on some sides of his property, but his property closely adjoins his neighbor's, and his driveway is next to the driveway of an "automobile repair place." (Doc. 44 at 65.) Also, the wire fencing largely kept people and animals out, instead of blocking the view like a fence with solid wood panels. This factor weighs against Defendant.

Taken together, the *Dunn* factors weigh in favor of the conclusion that Defendant had a reasonable expectation his outdoor living area would remain private and free from physical invasion. Thus, the outdoor living area, including the fire pit, should receive Fourth Amendment protection.

Warrantless searches of the curtilage are *per se* unreasonable under the Fourth Amendment, but one exception is the "knock and talk rule," "which allows an officer without a warrant to enter the curtilage and knock on the front door in an attempt to speak with the occupants or to ask for consent to search the premises." *Watson v. Pearson*, 928 F.3d 507, 512 (6th Cir. 2019) (citing *Florida v. Jardines*, 569 U.S. 1, 8 (2013)). "[W]here knocking at the front door is unsuccessful in spite of indications that someone is in or around the house, an officer may take reasonable steps to speak with the person being sought out even where such steps require an intrusion into the curtilage." *Hardesty v. Hamburg Tp.*, 461 F.3d 646, 654 (6th Cir. 2006). The "knock and talk" rule permits officers to enter the curtilage (such as the backyard of a residence) with the intent to contact any individuals thought to be inside the residence, but it does not permit officers to enter the curtilage with the intent of performing a search. *Watson*, 928 F.3d at 513.

"It is a long-standing rule that police do not conduct a search under the Fourth Amendment by seeing something that is in plain view." *Morgan v. Fairfield Cnty., Ohio*, 903 F.3d 553, 563 (6th Cir. 2018). But the plain-view exception "applies only when 'the officer did not violate the Fourth Amendment in arriving at the place where the evidence could be plainly viewed.'" *Id.* (quoting *United States v. Taylor*, 248 F.3d 506, 512 (6th Cir. 2001)). "[A]n officer must have a lawful right of access to any contraband he discovers in plain view in order to seize it without a warrant." *Collins v. Virginia*, 138 S. Ct. 1663, 1672 (2018).

Here, Saxe entered the property with the intent of conducting a lawful knock and talk because the police received a call about somebody shooting a gun near Defendant's residence. (Doc. 44 at 51.) He walked up to Defendant, asking him, "How's it going, James? Are you doing alright?" He then asked, "Where's your company at?" (*Id.* at 50–51.) Defendant voluntarily answered these questions and engaged in conversation. (Gov. Ex. 1 at 19:15:48–19:16:18.) Saxe testified that there was nothing between him and Defendant that prevented him from being able to walk up and talk to him; he did not have to move any objects or step over or walk around anything. (Doc. 44 at 23–24.) This is unlike *Watson*, where the officers admitted in their affidavits that they were walking around the curtilage to look for items that could possibly be levied, not to try to contact someone inside the residence. 928 F.3d at 513. Nothing in the record suggests that Saxe intruded into the curtilage with the intent of searching Defendant's property; rather, he merely walked fifteen to seventeen yards from a publicly accessible driveway to talk to Defendant, which is no more than what any private citizen might do. *Kentucky v. King*, 563 U.S. 452, 469 (2011). The Court disagrees with Defendant's contention that the "magistrate[']s holding suggests as long as Officer Saxe had reasonable suspicion he could walk

9

all over the property and observe." (Doc. 46 at 9.) Saxe did not "walk all over the property"—the body camera footage indicates he confined himself to the outdoor living area and the portion of the driveway where he parked. (*See generally* Gov. Ex. 1.) Therefore, Saxe conducted a valid knock and talk.

Because Saxe was conducting a knock and talk, he was lawfully standing in Defendant's curtilage when he saw the flare gun and ammunition in plain view. Saxe testified that he had already seen what he believed to be the flare gun and the ammunition. (Doc. 44 at 52.) Defendant also voluntarily told Saxe where the flare gun was, saying "right here" and pointing to it, when Saxe asked. (Gov. Ex. 1 at 19:16:18–19:16:20.) The plain-view exception applies, so Saxe lawfully seized the flare gun and ammunition without a warrant. *United States v. Estes*, 343 F. App'x 97, 100 (6th Cir. 2009) (affirming the district court's finding that an officer lawfully seized incriminating evidence in plain view on the driveway outside the residence without a warrant).

In sum, although Defendant's outdoor living area is curtilage protected by the Fourth Amendment, evidence of the flare gun and ammunition is admissible because the items were in plain view during a lawful knock and talk.

### B. Suppression of Defendant's Statements Prior to *Miranda* Warnings

Defendant objects that the R&R "ignores the private area where" he made his pre-*Miranda* statements to Saxe and that the R&R wrongfully relies on *Terry*. (Doc. 46 at 10.) He argues, "Saxe elicited [an] incriminating admission from [Defendant] where he had fired a gun as a felon. The question was designed to incriminate the defendant." (*Id.*) He contends that "the constitution required a warrant for entry into the private living areas which is curtilage by law

enforcement," and "[t]here is nothing about the facts of this case that suggest that [Defendant] consented to having deputy Saxe question him in the private places of his domicile and curtilage." (*Id.* at 10–11.) Therefore, he argues, the statements Defendant made before Saxe administered the *Miranda* warnings must be suppressed.

The Government responds that the conversation between Defendant and Saxe was "proper . . . to determine the scope of the situation at hand," in which "[s]everal of the 'questions' asked by Deputy Saxe were in response to questions or comments posed by the Defendant." (Doc. 50 at 6.) With the pre-*Miranda* encounter lasting less than three minutes, the Government argues *Miranda* warnings were not required. (*Id.*)

"Police may briefly stop an individual for investigation if they have a 'reasonable suspicion' that the individual has committed a crime." *Houston v. Clark Cnty. Sheriff Deputy John Does 1–5*, 174 F.3d 809, 813 (6th Cir. 1999) (quoting *United States v. Palomino*, 100 F.3d 446, 449 (6th Cir. 1996)). Reasonable suspicion requires "specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant" an investigatory stop. *Terry v. Ohio*, 392 U.S. 1, 21 (1968). The "officer may ask the detainee a moderate number of questions to determine his identity and to try to obtain information confirming or dispelling the officer's suspicions. But the detainee is not obliged to respond." *Berkemer v. McCarty*, 468 U.S. 420, 439–40 (1984). "[B]ecause of the very cursory and limited nature of a *Terry* stop, a suspect is not free to leave, yet is not entitled to full custody *Miranda* rights." *United States v. Salvo*, 133 F.3d 943, 949 (6th Cir. 1998). An officer may handcuff a suspect as a safety precaution, so the use of handcuffs does not transform a *Terry* stop into a formal arrest. *United States v. Atchley*, 474 F.3d 840, 849 (6th Cir. 2007) (citing *Houston*, 174 F.3d at 814).

11

As previously discussed, Saxe was lawfully on the curtilage with the intent of conducting a knock and talk. Defendant voluntarily answered Saxe's questions. Based on Defendant's voluntary answers, Saxe's previous knowledge of Defendant's status as a convicted felon, and the call reporting shots fired on Defendant's property, Saxe had reasonable suspicion to support his detention of Defendant.

Defendant contends that Saxe "marched into the secluded private area where [Defendant] was relaxing and began ordering him around and questioning him." (Doc. 46 at 11.) But Saxe was lawfully on the curtilage and he was permitted to ask Defendant questions because he had reasonable suspicion that Defendant had committed a crime—namely, being a felon in possession of a firearm and ammunition—under the totality of the circumstances. The body camera footage demonstrates that Saxe maintained a level, conversational tone with Defendant throughout the *Terry* stop. The Court also agrees with the R&R's conclusion that the *Terry* stop was reasonable in scope and duration. (Doc. 45 at 6.) Defendant points to no authority suggesting that a *Terry* stop cannot be lawfully conducted in the curtilage, nor has the Court found any authority supporting such a proposition. Additionally, many of Defendant's admissions were made before Saxe handcuffed him. Therefore, Saxe conducted a valid *Terry* stop, for which no *Miranda* warnings were required. Accordingly, the Court finds that Defendant's statements to Saxe prior to the administration of *Miranda* warnings are admissible.

## IV. <u>CONCLUSION</u>

For the foregoing reasons, the Court will **ACCEPT AND ADOPT** the R&R (Doc. 56) but **MODIFY** page four: Defendant's outdoor living area, including the fire pit, is curtilage. Defendant's motion to suppress will be **DENIED** (Doc. 32).

12

**AN APPROPRIATE ORDER WILL ENTER.**

                                        **/s/**
                                        **CURTIS L. COLLIER**
                                        **UNITED STATES DISTRICT JUDGE**